**IN THE UNITED STATES DISTRICT COURT**
**FOR THEDISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Case No.: 21-CR-595 (TJK)** |
| | : | |
| | : | |
| **v.** | : | **SENTENCING:  10/31/2023** |
| | : | |
| | : | |
| **JAMES DAVIS,** | : | |
| | : | |
| **Defendant.** | : | |

---

## MEMORANDUM IN AID OF SENTENCING
## AND REQUEST FOR VARIANCE

Defendant James Davis, through counsel, respectfully submits the following Memorandum in aid of his sentencing.  On October 31, 2023, James Davis will come before this Court to be sentenced pursuant to his guilty plea to Interfering with Law Enforcement During a Civil Disorder in violation of 18 U.S.C. § 231(a)(3).  Based on all the relevant factors in this case, Mr. Davis submits that a sentence of probation with a condition of home confinement is an appropriate resolution of this matter.  Due to such factors as the nature and circumstances of the offense, Mr. Davis's background, Mr. Davis's acceptance of responsibility and significant, demonstrated remorse for his participation in the events of January 6, 2021, the various sentencing factors pursuant to 18 U.S.C. § 3553(a), the proposed sentence is fair and reasonable.  Undersigned submits that Mr. Davis is not the same person he was on January 6, 2021, and incarceration in this case would be counterproductive.

## INTRODUCTION

After more than 1100 arrests and over 700 individual sentences imposed related to the events of January 6, 2021, there is little undersigned can say that has not already been said.  In its

Memorandum, the government aptly points to some data that gives some objective picture of the scale of the damage and destruction caused—$2,923,080.05 in damage to the United States Capitol, more than one hundred injured police officers, and approximately $629,056 in restitution for the Metropolitan Police Department.   There are no figures, however, to account for the subjective cost in psychological trauma to the involved officers, the citizens of the District of Columbia, and the damage to our body politic and civic health as a nation.   As our divided country races towards another election in approximately 12 months from Mr. Davis's sentencing date, the defense acknowledges the imperative to hold those who participated accountable for their actions that day.   At sentencing, Mr. Davis will stand before this Court eager to accept accountability for his actions in connection with this tragic day.

## BACKGROUND

Prior to July 28, 2021, Mr. Davis had never been arrested, charged with, or convicted of any crime.   On March 11, 1976, Mr. Davis was born.   His biological parents, particularly his biological mother, suffered from serious mental health issues, substance abuse problems, and alcoholism.   As a child, he suffered unimaginable physical, psychological, and sexual abuse at the hands of his mother, father, and later stepmother.   The details of this horrific abuse are detailed in the Presentence Report [hereinafter "PSR"] at ¶¶ 51-55.   Mr. Davis's early childhood years were scarred with significant trauma caused by the individuals who were supposed to care for him the most—his biological parents.

Mr. Davis's biological mother suffered extreme depression after losing her first child and spent time in and out of hospitalization for her mental health.   After returning from treatment, his mother brought home a friend from the hospital to live with the family.   Ultimately, Mr. Davis's father began having an affair with the woman who would later become his stepmother.   His

parents divorced and he and his younger brother were shuffled back and forth between each house.  One day his father found him and his brother unsupervised near the highway when he was supposed to be in his biological mother's custody.  At that point, his father refused to permit Mr. Davis and his brother to go to his biological mother's house who continued to self-medicate with drugs and alcohol.  However, the environment with his biological father was not much better as his stepmother also suffered from severe alcoholism and depression.  Mr. Davis's father often resorted to corporal punishment for discipline and abused him and his brother with a belt.  The environment was chaotic and dangerous.  In one instance, as a young child, Mr. Davis intervened when his stepmother pulled out a knife and attempted to stab his biological father who had taken alcohol away from her by physically inserting himself between his father and stepmother in the middle of the incident.

Mr. Davis recalls being put in a children's home the next day after that incident.  His biological father made a difficult decision and put Mr. Davis and his brother in a children's home when Mr. Davis was about eight years old after concluding that the home was too unstable for children.  Unfortunately, the children's home did not much improve Mr. Davis's childhood where he continued to be abused and traumatized after his parents abandoned him.  At the children's home, Mr. Davis was also surrounded by juvenile delinquents and many older children who were placed there by court order.  While at the children's home, his biological mother was allowed to take him for unsupervised offsite visits with her then new boyfriend.  It was during these visits that Mr. Davis witnessed his mother and her boyfriend use illegal drugs and some of the worst abuse reflected in the PSR occurred.

Fortunately, Mr. Davis and his brother were adopted by a loving family.  At about the age of 11, he got a second chance when Keith and Mary Davis adopted him and his brother.  At that

age for the first time most of his childhood needs began to be met, including food, shelter, and love.  Despite the extraordinarily difficult early childhood, Mr. Davis adjusted positively to the improved circumstances upon adoption.  He attended public schools in Pickerington, Ohio where he discovered a passion for music and was a vocalist in the school music program.  He was also a boy scout.  In high school, he participated in track as a pole vaulter and kept up good grades albeit struggling somewhat with math and science.  He also worked at fast food restaurants and lawn care in addition to his studies and extracurricular activities.

At an early age, Mr. Davis was called to service as he enlisted in the United States Marine Corp.  He saw it as an opportunity to get out on his own and become independent.  In addition, his biological father had served in the United States Navy, adopted maternal grandfather served in the Navy, adopted paternal grandfather served in the Army, and his adopted maternal grandmother served in the Marine Corp.  Mr. Davis found boot camp at MCRD Parris Island difficult after getting cellulitis in his left foot that ultimately caused him to slow down his unit. As a result, he was assaulted by fellow marines as a form of hazing and punishment for his perceived physical weaknesses.  Like something out of the movie Full Metal Jacket, his platoon took turns hitting him with socks filled with soap bars.  His time in the Marine Corp. boot camp was further punctuated with trauma where in one instance he was assaulted with a shovel to the head while he slept and in another instance witnessed a swim instructor shoot himself in the head and commit suicide.  Notwithstanding his trouble in the Marines, Mr. Davis sees his service as a big part of his identity.  He is proud to have served and believes in many of the core values the Marine Corp taught him.

After being discharged from the Marine Corp, he returned to Ohio where he visited his adopted parents and ultimately settled in Illinois.  In 1996, he met his now wife and love of his

4

life, Christy, in Quincy, Illinois.  They met while working together at a local retail store.  Together they enrolled in Western Illinois University while working to support themselves and pay tuition. They were married in 1999.  On somewhat of an impulse, he left school and the National Guard and joined the Active Duty Army after believing his wife was pregnant.  Ultimately, his wife turned out not to be diabetic but not pregnant, but he went on to serve in the National Guard and then ultimately active-duty Army from 2001 to 2004.  While serving in the Army, he was deployed to Kuwait in 2001-2002 where he served in a field artillery unit.  During his time in the Army, he received numerous awards and commendations, including, among others, the Army Commendation Medal, the Army Achievement Medal, the Global War on Terrorism Expeditionary Medal, the Army Good Conduct Medal, and the National Defense Service Medal. In 2004, he was honorably discharged from the Army.  Tragically, during his service near the Kuwait/Iraqi border he was exposed to Saran gas and depleted uranium contaminated soil when the British military detonated unexploded ordinance and mine fields left over from Desert Storm in the area unaware of the presence of American soldiers in the area.  Mr. Davis suffered a traumatic brain injury and was also exposed to burn pits and a toxic waste dump lake that he drove through.

After separation from the Army, he spent the next decade working in various civilian positions for the military, including the Department of Defense, Department of the Navy, and Department of the Army.  During this time, the federal government entrusted him with a top-secret security clearance.  After ten years working in personnel security for the United States military, he was ultimately separated in 2012 due to medical issues caused by his injury and exposure in Kuwait.  He currently receives Social Security Disability Income and Veterans Affair disability income.  During his career in civilian military positions, he received numerous awards

and promotions.  His physical health struggles continued to plague him during this time.  He also managed a long commute from Woodbridge, then later King George to the Pentagon.  The commute was particularly difficult because he lost his medical eligibility to obtain a driver's license because of his injuries from the incident in Kuwait and because of his sever narcolepsy with cataplexy.

A constant theme throughout his adult life has been dedication to the United States and to his faith.  Abandoned and near orphaned as a child, he has spent much of his life trying to fit in and be part of something greater than himself.  Despite his troubles in the Marines at a very young age, he remains dedicated to the Marine Corps to this day.  In contrast, his exemplary record with the Army further demonstrated his continued ability to learn from his mistakes, adapt, and improve himself as he matured.  However, due to persistent, chronic medical problems, he found himself practically retired by 2014 at the age of 37.  As a result of his medical condition, he has felt at times helpless, useless, lonely, and depressed.  In 2012, his wife, Christy, became gravely ill and was hospitalized in the intensive care unit and most of her internal organs shut down.  Miraculously, she recovered function in all organs except her kidneys.  After years of dialysis, in 2017, she was fortunate to receive a kidney transplant.  However, the transplant only resulted in her new kidney functioning at 40 percent.  This period in Mr. Davis's life was particularly difficult for Mr. Davis facing the loss of his career, the potential loss of his wife, and the continued deterioration of both of their physical health.

Conversely, another pervasive theme throughout Mr. Davis's life is his inability to cope with and acknowledge untreated mental health issues.  Tragically, the ghosts of Mr. Davis's childhood trauma have continued to haunt him throughout his life.  Mr. Davis struggled as a young Marine and was resistant to acknowledging untreated mental health issues that caused him

problems.  Notwithstanding these issues, he went on to succeed in the Army and later as a civilian DOD employee.  Nevertheless, he had previously resisted calls to acknowledge any potential mental disorders although he has did receive counseling in 1995 and 2012.  This reluctance stems from the fact that the source of most of his trauma—his biological mother—suffered from extreme mental health issues.  Mr. Davis has not spoken to his biological mother since 1996 and has spent his entire life trying to distance himself from her and her toxic and destructive behaviors.  This understandable impulse has at times been counterproductive in avoiding mental health diagnoses for fear of being anything "like her."  It perhaps took the events of the last two years and the impending potential loss of liberty to force Mr. Davis to genuinely seek help and to face his issues directly.  Undersigned respectfully submits that the Court should use this opportunity to build on the actual positive momentum that the arrest and prosecution in this case has caused in Mr. Davis's life and build on it with treatment and supervision rather than incarceration.

Accordingly, undersigned respectfully asks this Honorable Court to sentence Mr. Davis to a period of probation with a condition for home confinement.  There are many avenues the Court can take to reach this result.  As discussed further, *infra*, the defense is asking the Court to not apply the +3 enhancement for physical contact.  Under that scenario, Mr. Davis's guideline calculation would be 0-6 months and a probation sentence would be permissible.  Alternatively, if the Court decides to apply the enhancement, the defense requests the Court adopt the sentencing option as set forth in the PSR at ¶¶ 104, 121 and substitute home confinement for incarceration as a condition of probation pursuant to USSG § 5C1.1(c).  Finally, regardless of the Court's ultimate decision on the guideline calculation, undersigned submits that several separate and independent bases exist to apply a variance in this case and asks the Court to adopt as many as it

deems appropriate.

First, the defense requests the Court to apply a variance based on Mr. Davis's poor physical health.  Second, the defense requests the Court to apply a variance consistent with the PSR recommendations at ¶135(a) due to Mr. Davis's lack of criminal record and "need for incremental punishment."   Third, the defense request Court apply a downward variance consistent PSR ¶ 135(b) because Mr. Davis is a "zero-point offender" consistent with the soon-to-be updated USSG § 4C1.1.  Fourth, the Court should consider Mr. Davis's mental health issues as well as untreated, diagnosed, and undiagnosed traumas, as factors for a downward variance.  Finally, the Court should adopt a downward variance because the guideline range, if the physical contact enhancement is applied in this case, fails to properly reflect the § 3553 factors.

Each proposed reason provides a separate and independent basis for the Court to adopt a variance at sentencing and all five taken together bolster the argument for imposing the recommended proposed sentence, which varies from the government's recommendation and proposed guideline calculation.  Undersigned submits that Mr. Davis has fully demonstrated that he is not a danger to the community and has fundamentally changed his life since his arrest in this case over two years ago and is a worthy candidate for supervision, treatment, and home confinement, if necessary, rather than incarceration.

## **DISCUSSION**

## II.       THE POST-**BOOKER** SENTENCING FRAMEWORK.

Under Justice Breyer's majority opinion in *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. *See* 18 U.S.C. § 3553(a)(4)." *United States v. Booker*, 125 S.Ct. 738 (2005).  While holding  that district courts should still consider the Guideline calculations and ranges for

sentencing purposes, the remedial majority in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Pursuant to *Booker*, therefore, courts must treat the Guidelines as one, among several, sentencing factor.

Pursuant to 18 U.S.C. §§ 3562 and 3553(a) – which were explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.  Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the  need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the *Booker* majority:
No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of *Booker*, as well as Sections 3553, 3661, and 3582 of Title 18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining the appropriate sentence.   After *Booker*, courts need not justify sentences outside the guideline range by citing factors that take the case outside the "heartland."  Rather, as long as the sentence imposed is reasonable and supported by the factors outlined in Section 3553, courts may exercise their discretion in individual cases and impose sentences which are not within the proposed guideline range.

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors.  *See Rita v. United States*, 127 S.Ct. 2456 (2007) and *Gall v. United States*, 128 S.Ct. 586 (2007).  A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Id.*  The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable.   *Id.*   By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita* at 2465.  It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court recently reemphasized, '[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.' *Gall* at 598 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

## III.    STATUTORY PENALTIES

The statutory penalty for a conviction under 18 U.S.C § 231(a)(3) carries a maximum penalty of 5 years imprisonment, a fine of $250,000, and a maximum term of three years supervised release as well as a mandatory special assessment of $100.00.

## IV.    SENTENCING GUIDELINES

The sentencing guidelines do not expressly specify an applicable guideline for the civil disorder offense of 18 U.S.C. § 231(a)(3).  Where the guidelines do not promulgate an applicable guideline, courts are to apply the most analogous offense guideline.  *See* USSG § 2X5.1.  The most analogous guideline in this case is USSG § 2A2.4.  Pursuant to USSG § 2A2.4(a), the base offense level is 10.  The government and the United States Probation office ask the Court to apply a 3-level increase under USSG § 2A2.4(b)(1)(A) asserting the offense involved physical contact.  However, the government has not been consistent in its application of the physical-contact enhancement in the Capitol breach cases and the defense reserved the right to challenge the enhancement at sentencing.

If the Court applies the 3-level enhancement, Mr. Davis's guideline will be as follows.  Giving a 2-level reduction for Mr. Davis's acceptance of responsibility, probation calculates an advisory guideline range of 8 to 14 months of imprisonment, resulting from a total offense level of 11 and Criminal History Category I.  The guidelines further provide that the fine range for a total offense level of 11 is from $4,000 to $40,000, pursuant to USSG § 5E1.2(c)(3), and restitution must be ordered per USSG § 5E1.1.9.  While the above guidelines, however, are merely "the starting point," *Gall v. United States*, 552 U.S. 38, 49 (2007), they are not the only consideration in formulating a fair and just sentence, for no workable guideline could ever "account for many of the myriad factors that are properly considered in fashioning just

sentences." *United States v. Ovid*, 2010 WL 3940724, at *1 (E.D.N.Y. 2010).

First, if the Court declines to apply the 3-level enhancement, then Mr. Davis's guidelines would be a base offense level of 10 with a 2-level reduction for acceptance of responsibility, which would make his base level 8 with a 0–6-month range. Here, a probation sentence would be an advisory guideline sentence. If the Court declines to apply the 3-level enhancement for physical contact, then Mr. Davis's calculation for his base offense would be level 8 and in Zone A of the Sentencing Table. Under that scenario, a "sentence of imprisonment is not required." USSG § 5C1.1. If the Court adopts this calculation, a fine of $2,000.00 to $20,000.00 would be applicable pursuant to USSG § 5E1.2(c)(3). The restitution amount would not change.

**A. The Court Should Not Apply The 3 Level Physical Contact Enhancement.**

The defense argument for not applying physical contact enhancement is both legal and factual. In a purely literal factual sense, the video evidence and exhibits submitted do in fact reflect that "physical contact" between Mr. Davis and MPD officers occurred. That is not in dispute. However, there are two primary reasons the Court should not apply this enhancement. First, the type of physical contact that has occurred is not the type of contact the enhancement is intended to punish. Second, in several January 6, 2021 cases, defendants who engaged in materially worse conduct than Mr. Davis were given the benefit of pleading down to 18 U.S.C. § 231 in exchange for dismissal of their greater assault charge in violation of 18 U.S.C. § 111. In those cases, which in some instances involved violent assaults against law enforcement, the government requested the Court adopt the physical contact enhancement. In this case, Mr. Davis was not indicted for assaulting a police officer. However, the government required Mr. Davis to plea to the top charge, 18 U.S.C. § 231(a)(3). The government urges the Court to essentially treat Mr. Davis in the same manner as other January 6, 2021 defendants who engaged in worse—

assaultive conduct—despite the fact he accepted responsibility for the most serious charge and received no benefit to plea down to a lesser offense.

    1.  <u>The Enhancement Should not Apply to Any *De Minimis* Physical Contact.</u>

Many cases involving the application of physical contact enhancement typically involve physically assaultive conduct.   In *United States v. Ivory*, the District Judge affirmed the application of the 3-level physical contact enhancement where the defendant attempted to punch a correctional officer.  2022 WL 4586142 (M.D. Penn. 2022) (slip op.).  Even in that case, the Magistrate Judge subsequently applied a downward variance finding that the 3-level increase was "an over-representation of the conduct here" and found a one (rather than three) level increase was more appropriate.  In *U.S. v. Shelton*, the District Judge varied upward at sentencing for a violation of 18 U.S.C. § 111 where an inmate threw feces and urine at a correctional officer because the physical contact was "not like the physical contact involved with a push or a punch." 431 F.Supp.2d 675, 676 (E.D. Tex. 2006).

In *U.S. v. John*, the Second Circuit upheld in a summary order the application of the 3-level enhancement for physical contact where the defendant struck a Deputy United States Marshal and was convicted at trial of 18 U.S.C. § 111(a)(1).  259 Fed.Appx. 379 (2d Cir. 2008). In *United States v. Walters*, the District Judge applied the 3-level physical contact where the defendant "knocked the parcels" from a postal employee's arm, "attacked him from behind," "hit [the postal worker] in the groin," and subsequent to that assault "another altercation ensued."  253 F.Supp.3d 1033, 1035 (E.D. Wis. 2017).  In *United States v. Bullock*, the Court applied the 3-level physical contact enhancement where the defendant 'head-butted the officer in the face' while being transported by a correctional officer.  2022 WL 1671119 (M.D. Pa. 2022)

In this case, the government argues multiple specific instances constitute "physical

contact" for the purposes of the enhancement.  The government argues that Mr. Davis "pushed against the officer's shield with" his left hand.  Gov. Mem. at 9.  The action described taken in context is hardly material contact.  It is true that Mr. Davis is holding a stick and it's likely but not entirely clear based on the video that the outside of his left knuckles made contact with the officer's riot shield.  However, his feet are planted, and the stick is stationary.  It's at this point, Mr. Davis's main physical action is using his right hand to point at his hat.  Nothing in the video the government cites to evidences any push forward with his left hand holding the stick.  The contact appears incidental or that the officer reasonably pushed forward against the stick.

The most significant "physical contact" occurs at Gov. Ex. 5 at 11:22 (2:35:33 p.m.), Figure 12, in which Mr. Davis's stick makes contact with the officer's baton.  The defense does not dispute stick to stick contact occurs at that second.  However, at 11:19, three additional sets of legs and feet are seen coming up from behind Mr. Davis.



*Figure 1, Gov. Ex. 5 at 11:20 (2:35:31 p.m.)*

At 11:20, the individuals with brown shoes and green pants are directly behind Mr. Davis.

It also appears that the stick is angled back away from the officers from the top going down

rather than towards. These are additional rioters pushing (or being pushed forward) by the crowd

behind and up to Mr. Davis. At 2:35:32 pm, in Gov. Ex. 4, Figure 3 shows at one millisecond

prior to Government's Figure 12, from Officer A.S.'s BWC angle, there are three individuals

directly behind Mr. Davis appearing to contact his backpack:



*Figure 3, Gov. Ex. 4 at 2:35:32*

The stick-to-stick contact appears to be both defensive in nature from and caused by the

advancing crowd behind Mr. Davis and that both the officer and Mr. Davis use the sticks to

prevent actual bodily physical contact. At 2:34:35 of Gov. Ex. 4, Officer I.D. appears to push

back at Mr. Davis:



*Figure 4, Gov. Ex. 4 at 2:35:34*

A millisecond later, at 2:35:34, Mr. Davis still has his hand up pointing at his hat.  The government argues in Figure 13 that at 2:35:36, Mr. Davis pushes back against I.D.'s baton and puts his right hand on the officer's shoulder.  Gov. Mem. at 11, Figure 13.  However, at that exact same millisecond, from Officer I.D.'s BWC, an individual with a green scarf physically interacts with Mr. Davis and Officer I.D., influencing both of their movements:



*Figure 5, Gov. Ex. 5 at 2:35:36*

This physical intervention influences Mr. Davis's movements and is missed in the government's Figure 13. The defense does not dispute much of the government's characterization of physical actions starting at Figure 15. However, the defense argues that at this moment when the green scarfed man interjects himself, is when Mr. Davis begins having a medical episode that ultimately resulted in him collapsing to the ground unconscious. The defense further argues that the remaining "physical contact" outlined from this moment is caused by Mr. Davis's medical condition as he attempts to hold on to an officer to break his collapse and ultimate fall to the ground.

The defense, however, does not dispute that Mr. Davis advanced to the front of the crowd, used aggressive language, and caused any contact that occurred by virtue of consciously choosing to be at that time and place where it occurs. There is no question he interfered with these officers' ability to control the crowd and perform their official duties during a civil

disorder.  For those actions and choices, Mr. Davis will live the remainder of his life as a federal felon.  However, the defense argues that the contact that occurred should not give rise to a 3-level enhancement that increases his guideline minimum sentence by eight months (from 0 to 8 months)—particularly when the case law reflects the enhancement most commonly being used for overtly assaultive contact.  To do so would frustrate the purpose of the enhancement and other policy statements explicit in the guidelines and impose a sentence that is greater than necessary when considering all the 3553(a) factors.

2.  Applying the Enhancement Is Not Proportionate to the Conduct.

The defense respectfully submits that to do so would frustrate policy statements in the United States Sentencing Guidelines reflective of Congressional intent.  For example, USSG § A.1.3 states, in relevant part: "Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."  Mr. Davis acknowledges his conduct is severe.  However, it did not rise to the level of assaultive conduct that is most frequently associated with the enhancement.  To treat him as such would frustrate the stated intent for proportionality based on severity of conduct.  In addition, given the posture of other January 6 cases in which defendants who committed assaults were permitted to plea down to the lesser civil disorder offense and received the same guideline treatment could result in frustrating the need to avoid unwarranted sentence disparities in contravention of 18 U.S.C. § 3553(a)(6).

There are several instructive cases substantially dissimilar to Mr. Davis's conduct in which they received the same guideline calculation.  In *United States v. David Blair*, the defendant was indicted on nine counts for his participation in the January 6 riot, which included a count for assaulting a police officer in violation of 18 U.S.C. § 111(a)(1) and (b) where he thrust

his lacrosse stick with a confederate flag into an officer's chest.  21-CR-00186 [E.C.F. 51].  The government allowed him to plea to the civil disorder charge and he ended up with the same guideline calculation the government proposes here with a base level 10 and plus-three physical contact enhancement.

In *United States v. Robert Fairchild*, the defendant was indicted on eight counts for his participation in the January 6 riot, which included a count for Assaulting, Resisting, or Impeding Officers in violation of 18 U.S.C. 111 where the defendant "tussled" with law enforcement officers.  The government allowed the defendant to plea to 18 U.S.C. 231(a)(3) and dismissed, among other thing, a more serious 18 U.S.C. 111 (a)(1) and obstruction charge in violation of 18 U.S.C. 1512(c)(2).  As a result, Mr. Fairchild ended up with the same guideline calculation the government proposes here with a base level 10 and plus-three physical contact enhancement.

In *United States v. Julio Baquero*, the defendant was indicted for, among other things, assaulting law enforcement in violation of 18 U.S.C. 111(a)(1) after entering the Capitol Building "physically resisted officers," "grabbed the hand of MPD Officer" and "rushed the officers, trying to push one of the doors open."  21-CR-551.  21-CR-702 [E.C.F. 41].  The government allowed him to plea to the lower civil disorder charge in violation of 18 U.S.C. 231(a)(3).  Despite the assaultive conduct in connection with the civil disorder charge, the government did not seek the plus-three physical contact enhancement.  These cases all represent examples of defendants engaging in more serious conduct essentially receiving the same treatment as Mr. Davis.

**B. Even if the Court Applies the Physical Contact Enhancement, the Court Can and Should Impose a Guideline Sentence without Incarcerating Mr. Davis.**

In accordance with 18 U.S.C. § 3553(a)(3), the Court must consider the kinds of sentences available.  Accordingly, there are multiple avenues the Court could impose a guideline sentence in this case without significant incarceration.  First, while Mr. Davis, consistent with

his plea agreement, is not advocating for a downward departure, the United States Probation Office in its Presentence Report has set out several potential downward departures.  As reflected in the PSR, the Court may consider the defendant's physical condition as grounds for a departure, per USSG § 5H1.4.[1]  In addition, the PSR asserts that Mr. Davis's military service may be grounds for a downward departure, per USSG § 5H1.11.[2]

As further noted in the PSR, if the Court ultimately applies the 3-level enhancement for physical contact, it still has options in imposing a guideline sentence without incarcerating Mr. Davis.  *See, e.g., United States v. Davis*, 20 F.4th 1217, 1221–22 (8th Cir. 2021) (sentence constituted "a substantial punishment" and the Supreme Court has noted § 3553(a)(3) requires sentencing courts to consider noncustodial sentences).  Under USSG § 5C1.1(c)(3), the Court may satisfy the minimum prison term with a "sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention according to the schedule in subsection (e)."  Subsection (e)(3) permits the substitution of "[o]ne day of home detention for one day of imprisonment."  From the Commentary:

> 3. Subsection (c) provides that where the applicable guideline range is in Zone B of the Sentencing Table (i.e., the minimum term of imprisonment specified in the applicable guideline range is at least one but not more than nine months), the court has three options:
>
> (A) It may impose a sentence of imprisonment.
>
> (B) It may impose a sentence of probation provided that it includes a condition of probation requiring a period of intermittent confinement, community confinement, or home detention, or combination of intermittent confinement, community

---

[1] Policy Statement, in relevant part: "An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."  The defense is requesting a variance rather than a departure for this issue.

[2] Policy Statement, in relevant part: "Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."

confinement, and home detention, sufficient to satisfy the minimum period of imprisonment specified in the guideline range. **For example, where the guideline range is 4-10 months, a sentence of probation with a condition requiring at least four months of intermittent confinement, community confinement, or home detention would satisfy the minimum term of imprisonment specified in the guideline range.** Here, the Court could potentially agree with the government's calculation and sentence Mr. Davis to a period of probation with a condition of eight months home confinement rather than imprisonment.

In this case, the Court can and should impose a guideline sentence without sentencing Mr. Davis to a significant period of incarceration. Even if the Court chooses to apply the physical contact enhancement and declines to impose one of the many applicable variances, it should still sentence Mr. Davis to probation with a condition of home confinement substituted for the period of incarceration. Notwithstanding the above, the defense still submits that the 3553(a) factors favor applying a downward variance.

## V.   A SENTENCE OF PROBATION WITH HOME CONFINEMENT IS REASONABLE AND APPROPRIATE

### A.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT.

In accordance with 18 U.S.C. § 3553(a)(1), courts are to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" when imposing sentence. When considering these factors, it is clear probation and a condition of substituted home confinement pursuant to USSG § 5C1.1(c)(3) is an appropriate sentence for Mr. Davis is if the Court deems incarceration appropriate.

#### 1.   Nature and Circumstances of the Offense

Mr. Davis does not deny that the charges against him are serious. The nature and circumstances of Mr. Davis's conduct are discussed in the Offense Conduct section above. Aside from his involvement in the 2020 election, Mr. Davis has otherwise lived a law-abiding life. It should be further noted that Mr. Davis never entered the Capitol building. He did not

engage in property destruction or encourage others to do so and he has demonstrated sincere remorse and contrition.

Mr. Davis became involved in politics initially through his decade-long advocacy for veterans.  After being medically retired and placed on disability, Mr. Davis sought out the kind of purpose and meaning he received serving the military as a solider and then ultimately a DOD civilian employee.  Mr. Davis had a professional career working as a DOD civilian employee in which he received recognition for his professionalism, work ethic, service and expertise.  At the height of his career, he was responsible for providing briefings to the Secretary of the Army and earned a Top Secret/Sensitive Compartmented Information ("TS/SCI") Clearance.  After serving in Kuwait and reaching the halls of the Pentagon, in 2013, Mr. Davis found himself without a career, without a purpose, and deteriorating health.

In 2014, he found solace working as a customer service representative for the Coalition to Salute America's Hero's, which is a nonprofit organization serving seriously wounded veterans in Afghanistan and Iraq with a stated mission to "ensure that in return for the sacrifices they made for us, these wounded veterans and their families receive all the support needed to restore their hope and rebuild their lives."  During that time, Mr. Davis also became active in his local American Legion.  Advocating for veterans during this time became a passion and purpose for Mr. Davis.  It gave him a sense of belonging and camaraderie.  Most of all, having lost his career due to his health—something outside of his control—it empowered him to feel that he could still serve in some capacity.

He continued to stay active in veteran's advocacy throughout the 2010s.  In 2013, he graduated from the American Legion Department of Virginia Leadership College and became a Certified Veteran's Advocate.  *Ex 17*.  In 2015, he completed the American Legion's Post

Service Officers Training in Advocacy Skills course.  *Ex 18.*  In 2018, he completed the leadership college once again.  *Ex 19.*  Prior to the 2020 election, Mr. Davis's involvement in politics and activism was limited to voting.  This changed in connection with changes to Virginia law that he and other veterans in his orbit interpreted as infringing upon the Second Amendment of the United States Constitution.

As Mr. Davis describes it, he had walked away from God at this time due to the previously mentioned health problems both he and his wife suffered.  Feelings of extreme helplessness came close to pushing him to suicide and ultimately made him vulnerable to extremist messages pushed on social media, a local Virginia gubernatorial campaign he volunteered for, the former President, and ultimately the Proud Boys.  As District Judge Mehta put it in the sentencing of Andrew Cavanaugh, he became engulfed in

> the power of the propaganda; the power of being told lies over and over and over again; told by leaders who knew better that something was taken away from people when it wasn't. It was an honest and fair election by every measure, yet people were told over and over and over again something that was not true, so much so that people like [the defendant] lost his way. While he's not blameless . . . [t]he idea that, you know, people who have otherwise led modest and humble lives, who have not been political agitators, political activists, are now facing serious jail time is extraordinary. (*See* Oct. 13, 2022 Sentencing Hr'g Tr. at 27-28, US v. Cavanaugh, Case No. 1:21-cr-362-APM [Doc. 41].)

In the summer of 2020, Mr. Davis's social media algorithm fed him a steady diet of images, videos, memes, and other material that convinced him the Black Lives Matter Movement and "Antifa" were Marxist terrorist organizations bent on terrorizing police and citizens, defacing veteran's monuments, terrorizing citizens, and seeking to overthrow the United States government.  The then-President of the United States very publicly and very frequently added fuel to this fire.

The extremist Proud Boys group was well known to target former military for

"recruitment because of their tactical knowledge and the inherent social credibility they carry."[3] Mr. Davis like all human beings had a desire to be part of a tribe.  In the run up to the election, he fed on a steady diet of Fox News, the former President's statements, and other conservative media outlets pushing the narrative that law abiding citizens were under siege by Marxists and anarchists.  Proud Boys also looked past his physical limitations and made him feel for the first time in over a decade that he was physically capable of serving and protecting.  All that said, Mr. Davis, however, does not blame others for the series of bad decisions that began in the fall of 2020 and lead him to be sentenced as a convicted felon before this Honorable Court.

According to Mr. Davis, he walked away from God and made these choices.  While he may have allowed himself to believe the Proud Boys stood for something honorable like protecting law enforcement from "agitators and miscreants" terrorizing the nation's capital in the summer of 2020, he fully acknowledges now that the warning signs were in front of his face. In fact, a dear friend of his from the American Legion he has known for over 15 years who drove him to various political rallies repeatedly warned him the group was a "hate group" looking for trouble.  Undersigned has spoken to this individual who confirms on several occasions, he drove him to political rallies to meet up with Proud Boys associates and gave Mr. Davis these warnings. He also noted that on several occasions his Proud Boys associates abandoned Mr. Davis in a crowd on a whim and he would have to come pick him up stranded somewhere outside of a Virginia political rally.

Mr. Davis acknowledges the signs were right in front of his face—not the least coming from his wife Christy who was outraged at his participation with the group.  While any outside

---

[3] Proud Boys and Oath Keepers, Extremist Groups that Target Vets for Recruiting, at the Center of Jan. 6 Investigation, Konstantin Toropin, Military News, June 10, 2022, *available at* https://www.military.com/daily-news/2022/06/09/proud-boys-and-oath-keepers-extremist-groups-target-vets-recruiting-center-of-jan-6-investigation.html.

observer could easily interpret the situation as the Proud Boys exploiting a depressed, lonely, and isolated individual searching for belonging, Mr. Davis does not see the situation that way. He characterizes this period of his life as the "storm" that was necessary to make him see the light to return to his faith and devotion to God.  Mr. Davis knows and understands that he made these decisions and accepts responsibility for his words, deeds, and actions.  None of this background excuses his conduct in the run up to, during, and in the immediate aftermath of January 6, 2021.  Its only submitted to provide context for how someone who overcame an extraordinary difficult early childhood to adopt laudable values and commit to service of others then end up making such bad decisions in short period of time.

The government argues that the "nature and circumstances of Davis's offense were of the utmost seriousness."  Mr. Davis does not disagree.  The disagreement lies in whether incarceration is needed for Mr. Davis to reflect just punishment.  Here, undersigned strenuously disagrees with the government.  Redemption is powerful and one need not be put in a cage to achieve it.  It starts with self-reflection, accountability, and acceptance of responsibility.  Mr. Davis has fundamentally changed his mindset during this case from dissonance, excuse making, and obfuscation to clarity of purpose and ownership of mistakes.  And while undersigned submits that Mr. Davis began his path to redemption prior to his arrest when he quit the Proud Boys shortly after January 6, 2021, at their so-called "after action" meeting, it has crystallized through his actions and behavior during the pendency of this case to which undersigned has been a firsthand observer.  At the heart of his redemption is Mr. Davis's demonstrated remorse toward the officers that day.

2.      *Mr. Davis's History and Characteristics*



*Figure 6 Assorted Historical Photographs of Mr. Davis History Prior to Jan 6, 2021*

Several facts about Mr. Davis's history and characteristics support the proposed sentence in this case. Following his plea in this case, Mr. Davis willingly cooperated with the arresting officers. His cooperation with the government was full, transparent, and complete. *See* Gov. Mem. at 17-18. In addition, Mr. Davis's character, physical and mental condition support the proposed sentence in this case. Furthermore, his community ties, past conduct, and family and

community support strengthen the argument for the proposed sentence. Above all, his demonstrated outpouring of remorse for the incident supports the proposed sentence in this case. Mr. Davis's family, friends, and fellow parishioners have detailed his regret, humiliation, and remorse in connection with his participation in January 6. His wife, Christy, notes "he is remorseful of his actions, language, and rage against officers and at the capital" and "does not recognize the person that he was." *Ex. 1* at 4. His adopted parents have observed both his shame and regret, *Ex.* 2 at 2, and his in laws have observed him "express remorse." *Ex. 3* at 2.

Mr. Davis's shame, guilt, and remorse is also evident to his friends. Close family friend and employer of his wife, Mary, personally observed "him share with his Saturday morning Bible Study group about his remorse and shame he feels for his conduct that day." *Ex. 4* at 3. Notably, their neighbor and daughter of a Metropolitan Police Department officer believes in "forgiveness and second chances" having witnessed him "live with the guilt and regret for his actions that day." *Ex. 5* at 2. In addition, his pastor describes "how his perspective on life as changed" and "expressed brokenness for his involvement on January 6 and remorse for how he treated law enforcement officers that day." *Ex. 7*. Other members of his congregation have described how Mr. Davis "has exhibited a realization of his failures," *Ex. 8*, "explained how remorseful and disrespectful he was on January" *Ex 9*, and how "ashamed of his disrespectful conduct" and "remorseful that officers were injured." *Ex. 12*. Not only has Mr. Davis's remorse been evident to his friends and family, but the government has also noted he has "expressed remorse for how his actions impacted police officers that day," and that he "appears humiliated. . . does not recognize the person he sees in these videos" and expressed "true remorse." Gov. Mem. at 17-18. Finally, these same feelings were expressed to the probation officer. PSR ¶ 32.

The extraordinary outpouring of support from his community in letters provided paint a

much different picture than the bluster and bravado exhibited in Telegram communications and footage from January 6, 2021. Uniformly, these supportive family and community members speak of Mr. Davis's remorse, faith, and how he is an integral member of his supportive marriage who has fully accepted responsibility for his actions. It is not just the remarkable demonstration of remorse for his conduct, but these letters also describe how the period in his life in which he became involved with the Proud Boys was isolated, uncharacteristic, and driven by fear, anger, and desperation after years of coping with his wife's medical struggles as well as feelings of hopelessness and powerlessness as his own health deteriorated robbing him of purpose and control over his own life. His family and closest friends who have known him since long before 2020 described Mr. Davis as "very moral, gentle and God fearing," *Ex. 6*, "helpful," "works until he has no more energy to give and then gives a little more." *Ex. 4*.

In some ways, these letters reflect a transformation that Mr. Davis has undergone since his participation in the events of January 6, 2021. However, a closer read reveals something deeper— a return and in some ways an improvement to the moral and law-abiding, supportive person he was prior to getting involved in politics, embracing propaganda, and consorting with an extremist group like the Proud Boys. These letters reflect the start and continuation of his rehabilitation. All of this has been achieved in his current environment under the threat of incarceration. Incarcerating Mr. Davis now would interrupt and frustrate this progress. These letters demonstrate what many studies show that the best medicine for rehabilitation is family and community support—not placing him in an abusive, punitive environment, surrounded by other convicted offenders. Taken together, Mr. Davis's positive personal history, characteristics and abundant family and community support all favor the proposed sentence of probation with a condition of home-confinement. Undersigned respectfully requests the Court apply a downward variance

based on his extraordinary family and community support.[4]  Finally, the letters reflect that Mr. Davis and his wife provide mutual care for each other.  Without kids or family nearby, Christy depends on Mr. Davis just as he needs her care.[5]  *See Ex. 1*; *Ex. 3*; *Ex. 4*; *Ex. 5*; *Ex. 6*; *Ex. 7*.

      c.       <u>FACTORS PURSUANT TO 18 U.S.C. § 3553(a)(2).</u>

18 U.S.C. § 3553(a)(2) provides sentencing courts with various factors to consider when imposing sentence. When considering factors under 18 U.S.C. § 3553(a)(2), it is critical that sentencing courts follow the mandatory limitations set forth in 18 U.S.C. § 3553(a).  In accordance with § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply  with  the  purposes  set  forth  in  [18  U.S.C.  §  3553(a)(2)]."  When  considering  factors discussed in 18 U.S.C. § 3553(a)(2), it is clear that a sentence exceeding time served in the instant case is a sentence that is greater than necessary.

            1.      *Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment*

Mr. Davis recognizes that the offense he committed is serious.  There is no question or excuse for the dangerous behavior he engaged in that lead to his arrest.  In fairness, however, Mr. Davis's offense is not as serious as offenses involving the exploitation of children or intentional assaultive conduct towards others that results in significant injury.   Mr. Davis conduct did not involve any physical injury to anyone other than himself—although it is without question that he behaved aggressively to officers and played an active role in the events of that day.  However, he

---

[4] *See, e.g., United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming downward variance based in part on "the support that the defendant stood to receive from his family[ and] personal qualities indicating his potential for rehabilitation")

[5] *United States v. Muñoz-Nava*, 524 F.3d 1137, 1143, 1148 (10th Cir. 2008) (record supported finding extraordinary family circumstances; defendant cared for his eight-year-old son as a single parent and had elderly parents with serious medical problems); *United States v. Lehmann*, 513 F.3d 805, 806, 809 (8th Cir. 2008) (per curiam) (affirming downward variance where the court found that a prison sentence would negatively affect the defendant's disabled young son).

did not enter the Capitol building, destroy government property, or physically assault any police officer.   Moreover, in this case, the seriousness of Mr. Davis's conduct is significantly mitigated by his genuine demonstration of remorse, cooperation with law enforcement, acceptance of responsibility, and post-arrest conduct.   Due to these factors, sentencing Mr. Davis to a period of probation with a condition of home confinement will adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

2.   <em>Deterrence</em>

Studies concerning deterrence do not support sentencing Mr. Davis to a period of incarceration that exceeds the amount of time he has already served.   Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).   "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."   *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").   Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.   *Id*. at 1.     It examined the effects of changes to both the certainty and severity of punishment. *Id*.   While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime

rates . . . were not sufficient to achieve statistical significance." *Id.* at 2.  The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.  For these reasons, any sentence more than probation with a condition of home confinement will be greater than necessary for purposes of achieving the goal of deterrence.

### 3. Protecting the Public

In addition to a remarkable demonstration of acceptance of responsibility, Mr. Davis's post-offense conduct shows how he is dedicated to living a moral and good life and how Mr. Davis is a generally good person whose desire for belonging, unaddressed trauma, and need for acceptance made him an easy target of manipulation of the extremist Proud Boys organization. Undersigned further respectfully submits that Mr. Davis is no danger to the public.  His entire life, other than his participation in the events of January 6 has demonstrated this fact.  His more than two-year impeccable compliance with his pretrial release conditions demonstrates this fact.  His extraordinary showing of remorse demonstrates this fact.  Finally, his dedicated family, friends, and church community are providing him with the support he needs to avoid recidivism.

### 4. Educational or Vocational Training, Medical Care, or Other Correctional Treatment

Incarcerating Mr. Davis will surely not further any legitimate educational, vocational, medical, or correctional purpose.   Mr. Davis is a Marine and Army veteran who attended but did not graduate college.  He is medically retired, has previously been employed, and has obtained numerous training and vocational certificates in the past.  He has found purpose through his renewed dedication to his faith, his online ministry, his weekly men's bible study, and volunteer work helping his wife both as a caregiver and volunteering to help her at work.  He does not have significant need for substance abuse treatment although mental health treatment through

probation would help serve to resolve his unaddressed childhood trauma, abuse endured as a Marine, and subsequent mental struggles caused by his physical health deteriorating. Furthermore, the most significant barrier to Mr. Davis's finding and maintaining substantial gainful employment is his poor physical health and disability, which imposing a prison sentence will not improve.  In fact, serving a substantial prison sentence would likely worsen Mr. Davis's health.

Mr. Davis's physical health problems are detailed in many of the support letters provided as friends and family have recounted their observations over the years and in the PSR ¶¶ 62-66 and have been verified by medical records provided to the report writer.  It began with toxic chemical exposure in Kuwait and has plagued him since.  These problems cut both his Army career and civilian career short due to being determined 100% disability.  He experiences blackouts and temporary paralysis as a result of narcolepsy and cataplexy.  As Mr. Davis's physician through the VA, Dr. Raman, notes his condition "manifests with abrupt full body paralysis which if untreated, can lead to falls with bodily injuries."  *Ex. 15*.  It is in fact this condition that caused Mr. Davis to collapse and grab onto officers for support during the instant offense.  Mr. Davis has been lucky to have received hyperbaric oxygen treatment first in 2014 and then again in 2019, which positively affected his condition.  However, the treatment is expensive, not covered by insurance, and its positive effects diminish over time.

Much of the video evidence regarding Mr. James participation in the events of January 6 does not appear to show an individual with severe cognitive and mobility problems.  However, observations of his friends and family, his medical records, and permanent disability show the true extent of his episodic debilitating condition.  Like many individuals with chronic episodic conditions, some days are better than others.  The numerous medications he regularly takes are

also well documented in PSR ¶ 63.  While the defense is not asking for a departure based on Mr. Davis's medical issues, the Court can and should use Mr. Davis's medical issues as a basis to apply a variance.  *See, e.g., United States v. McFarlin*, 535 F.3d 808, 810–12 (8th Cir. 2008) (variance to a sentence of probation was warranted in part based on the defendant's "poor health" and "need for medical care).

### d.   THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES.

In fashioning an appropriate sentence, sentencing courts are to consider "the need to avoid unwarranted sentencing disparities among defendants of similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  The government cites three specific examples of sentences imposed in January 6 cases to support its recommendation for 8 months of incarceration.  The defense agrees with its position regarding the similarities between *United States v. Bernard Sirr*.  However, in regard to Mr. Presley and Mr. Baugh, the defense respectfully disagrees.  Regarding Mr. Baugh, he came to the Capitol with his friend Mark Mazza whom Mr. Baugh knew brought a loaded firearm with him.  In addition, Mr. Baugh apparently lied to the FBI and the grand jury when he denied entering the tunnel and participating in the violence connected to the "heave-ho."

Regarding Mr. Presley, several important distinctions exist between his conduct and Mr. Davis's.  First, Mr. Presley entered the Capitol building and made his way to the Rotunda.  In addition, at the time of sentencing, Mr. Presley had prior state court convictions for domestic violence, reckless endangerment, driving while impaired, and felony burglary.  Mr. Presley's significant criminal history alone makes him someone who does not have a "similar record" to Mr. Davis—who aside from the events of January 6, 2021 has no criminal history.

The defense submits that a more analogous case involves *United States v. Eric*

*Gerwatowski*, 22-CR-125 where the defendant plead to a single count of 18 U.S.C. 231(a)(3) and was sentenced to a period of 24 months' probation.  Eric Gerwatowski came to the Capitol on January 6, 2021, because he believed the election had been stolen, and "the commies are trying to steal the country."  Gov. Mem., *United States v. Gerwatowski*, No. 22-cr-125-JMC (2/16/23) [ECF NO. 29] at 6.   In "plain sight" of police officers, Mr. Gerwatowski "pulled open one of the doors the Capitol Police had just closed . . . [,] turned to the crowd and yelled 'Let's Go!' and directed more rioters inside the Capitol." Id. at 3-4.   According to the government, "Gerwatowski's actions directly led to over a dozen rioters enter[ing] the building."  *Id*. at 4. On those facts, the government recommended 3 months' incarceration, but the Court imposed a sentence of 24 months' probation.

In *United States v. Griswold*, No. 21-cr-459-CRC, the defendant "enthusiastically participated in the January 6, 2021 attack on the United States Capitol, … push[ing] his way into the Capitol, past police trying to guard the Rotunda Doors, and then through the building, thrusting his hands in the air and yelling in triumph."  Gov. Mem., *United States v. Griswold*, No. 21-cr-459-CRC [ECF No. 52].  He entered the Senate Gallery, yelling, "this is our house now," and later gave an interview "gloat[ing] that Members of Congress "ran and hid" while "we took the building," and threatened, "we will fucking do it again." *Id*.

In both cases, like Mr. Davis, the defendants were not charged with assaulting police officers, had no criminal record, used aggressive language, and behavior interfered with the officers ability to control the crowd.  Griswold deleted evidence from his phone, but unlike Mr. Davis "continue[d] to minimize and excuse his conduct" through sentencing. *Id*.  On those facts, the government recommended 5 months' incarceration, and the Court imposed a sentence of 75 days' incarceration.  Finally, as demonstrated by Gerwatowski, a probationary sentence is not

unprecedented in these cases and justified when applying the § 3553 factors.

## CONCLUSION

Just punishment in this case does not require the imposition of a sentence as high as the government's calculation of the advisory guideline range.  For the reasons discussed above, a sentence of probation with a condition of home-confinement is reasonable and appropriate.  Such a sentence sufficiently addresses Mr. Davis's conduct as well as the factors pursuant to 18 U.S.C. § 3553(a).   Sentencing Mr. Davis to a period of incarceration will impermissibly impose upon him a sentence greater than necessary.   Accordingly, Mr. Davis respectfully requests that the Court impose a sentence of probation and substitute any period of incarceration with a condition of home confinement if the Court deems appropriate.


Respectfully Submitted,


SCROFANO LAW PC


BY: _____

Joseph A. Scrofano [Bar No: 994083]
*Counsel for James Davis*
600 F Street NW, Suite 300
Washington, DC 20004
jas@scrofanolaw.com
Ph: 202-870-0889